[No. B026728. Second Dist., Div. One. Apr. 26, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
JACOB TURNER III, Defendant and Appellant.

[Opinion certified for partial publication.*]

* Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of parts II, III, IV and V.

COUNSEL

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Andrew D. Amerson and Karen Bissonnette, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ORTEGA, J.**—A jury convicted Jacob Turner III (Turner) of rape and kidnapping with use of a firearm, and attempted rape. (Pen. Code, §§ 261, subd. (2), 207, subd. (a), 12022.5, subd. (a), 664.) The court found Turner had sustained prior convictions for rape, residential burglary, and felonious assault and sentenced him to 17 years in prison. (Pen. Code, §§ 667, subd. (a), 667.5, subd. (b).) In the published portion of this opinion, we find the trial court properly admitted the preliminary hearing testimony of a victim who was medically unavailable to testify at trial. In the unpublished portion of the opinion we reject Turner's remaining claims of error. We affirm the judgment.

FACTS

Turner does not challenge the sufficiency of the evidence. On January 25, 1983, Turner approached Roeshell N. at a bus stop in South Los Angeles, introduced himself, and offered her a ride. When Ms. N. accepted, Turner instead drove to Exposition Park and tried to rape her. Ms. N. pushed him away, escaped, and summoned help.

About 7:30 a.m. on July 9, 1983, Turner approached Bedetha W. at a bus stop and offered her a ride. Ms. W. declined and Turner drove off. Turner returned, ordered Ms. W. into the car at gunpoint, and drove to an alley. After silencing Ms. W. by threatening to shoot her, Turner raped her. Ms. W. escaped and summoned help.

In defense, Turner admitted soliciting consensual sex with both women, but claimed they rejected his overtures and left. Turner denied possessing a gun.

On December 11 and 12, 1985, before trial, the prosecution sought to admit Ms. W.'s preliminary hearing testimony, claiming she was medically unavailable to testify at trial. The trial court conducted a hearing at which the following evidence was presented:

Los Angeles Police Detective David Grabelski, an experienced sexual assault investigator, interviewed Ms. W. several times shortly after the crimes. Although apprehensive, Ms. W. was cooperative, gave detailed statements, viewed photographs, and wanted the perpetrator caught. A few weeks later, the detective served Ms. W. a subpoena for the preliminary hearing. Ms. W. was upset because Turner's relatives had discovered her address and come to her home. Although they had not threatened her, they had used religious appeals to make her feel guilty. Detective Grabelski later drove Ms. W. to the preliminary hearing. When she learned Turner was representing himself and would personally question her, she became upset. After a long talk with the detective, she agreed to and did testify. Afterward, Ms. W. was relieved that she would not have to testify again.

Six months later, Detective Grabelski again contacted Ms. W. Turner's case had been dismissed and refiled. When told she would have to testify at a second preliminary hearing, she became extremely distraught. The detective enlisted relatives who helped persuade Ms. W. to testify.

Regina Aldrege, a victim's witness services representative for the district attorney's office, also assisted Ms. W before and during the second preliminary hearing. Aldrege helped transport Ms. W. to court. Ms. W. told Aldrege she was very nervous about testifying, had suffered hair loss, and felt confronting Turner forced her to repeatedly relive the crime. In addition, the constant court appearances threatened Ms. W's employment and schooling.

In January 1985, concerned that Ms. W.'s mood had deteriorated, Aldrege arranged for and drove Ms. W. to a counseling session with licensed clinical social worker Rose Monteiro. Monteiro held a master's degree in social work, had 17 years of clinical experience, and specialized in treating people in crisis suffering from posttraumatic stress syndrome, especially rape victims. According to Monteiro, trauma victims experience emotional despair, fear, distrust, helplessness, and loss of control. While therapy cannot eliminate the trauma, it develops coping mechanisms to help the victim regain control. Some victims become increasingly depressed, passive, and reluctant to relive the traumatizing event.

In her counseling session with Monteiro, Ms. W. was reluctant to discuss the crimes, felt increasingly hopeless that further participation in Turner's

case would accomplish anything, worried about possible loss of employment and education, and was emotionally distraught, depressed, and traumatized. Although she agreed she needed treatment, Ms. W. was reluctant because she was increasingly frightened. Monteiro arranged another appointment and, along with Aldrege, offered to assist with transportation. However, Ms. W. missed the second appointment, and told Monteiro and Aldrege she could not continue treatment. Neither Monteiro nor Aldrege heard from Ms. W. again.

In January 1985 Detective Grabelski drove Ms. W. to the second preliminary hearing. Ms. W. testified despite being far more reluctant and upset than at the first hearing.

In August 1985 Detective Grabelski met Ms. W. at her home to arrange for her to provide court-ordered blood and saliva samples. Although it was 1 p.m., the blinds were shut, the lights were off, and the television, with the volume low, was in the middle of the room facing a chair two feet away. Ms. W. was more depressed and told the detective the case made her physically ill and unable to sleep. After nearly an hour, Ms. W. agreed to provide the samples. Detective Grabelski placed a subpoena on the coffee table and told Ms. W. she would have to appear the next week.

A few days later, on August 19, 1985, the detective went to Ms. W.'s home to drive her to a hospital to provide the samples, but no one answered. When contacted by Detective Grabelski, a relative of Ms. W.'s related that Ms. W. had mentioned the appointment with the detective. On August 21, 1985, Detective Grabelski met Ms. W. at her home. She told him she became sick thinking about the case, would not provide the samples or testify, and wanted no further contact with the detective, whose presence made her physically ill.

On September 30, 1985, defense investigator Jimmy Grant interviewed Ms. W. at her home. Ms. W. was calm, cordial, and answered detailed questions about the rape. Ms. W. said she wanted nothing more to do with the case and would not accept a subpoena or return to court. On October 12, 1985, Ms. W. refused to let Grant enter and said he would have to return later. On December 9, 1985, Ms. W. again refused to let Grant enter or discuss the case. Grant said he would see her in court, and Ms. W. agreed.

On December 10, 1985, Deputy District Attorney Stanley Williams, his investigator, and Ms. W.'s cousin, Mary Cox, went to Ms. W.'s home to try to serve her with a subpoena. Another relative permitted only Williams and Cox to enter. Williams stayed in the living room while Cox entered a closed

bedroom. Williams heard hysterical shouts of "no." When Cox emerged, she told Williams that Ms. W. was not the same person and would not testify. Williams heard Ms. W. order them to leave the house and not return. Williams's investigator was only authorized to physically take someone to court if a warrant or body attachment had been issued. Williams did not attempt service because he never saw Ms. W.

Based on her training, experience, personal contact with Ms. W., and Ms. W.'s prior and subsequent behavior testified to by the other witnesses and postulated in a hypothetical question, Monteiro opined that Ms. W. was severely depressed and in psychological decline. While it was not physically impossible for her to testify, Ms. W. would be harmed, not helped, by testifying. Testifying would inflict substantial trauma on Ms. W.

The trial court found that Ms. W. was unavailable and permitted the prosecution to introduce her preliminary hearing testimony.

## ISSUES

Turner contends the trial court erred in: (I) finding Ms. W. medically unavailable and admitting her preliminary hearing testimony; (II) excluding evidence that Ms. W. refused to provide court-ordered blood and saliva samples; (III) denying his motion to set aside the information (Pen. Code, § 995) based on the magistrate's alleged denial of his motions to represent himself and continue the hearing; (IV) denying his pretrial motion to dismiss for destruction or nonpreservation of evidence; and (V) imposing a five-year enhancement for his prior residential burglary conviction because the evidence failed to establish that the burglary was residential, and imposing a full-term consecutive sentence for the subordinate term without stating adequate reasons.

## DISCUSSION

### I

Turner's contention that the trial court erred in finding Ms. W. unavailable and permitting introduction of her preliminary hearing testimony lacks merit. Evidence Code[1] section 1291 provides: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine

---

[1] Unless otherwise noted, all further statutory references are to the Evidence Code.

the declarant with an interest and motive similar to that which he has at the hearing. . . ." Section 240 provides: "(a) . . . 'unavailable as a witness' means that the declarant is any of the following: . . . [¶] (3) Dead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity. . . . [¶] (c) Expert testimony which establishes that physical or mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness is physically unable to testify or is unable to testify without suffering substantial trauma may constitute a sufficient showing of unavailability pursuant to paragraph (3) of subdivision (a). As used in this section, the term 'expert' means . . . any person described by subdivision . . . (c) . . . of Section 1010." Section 1010, subdivision (c) lists licensed clinical social workers engaging in applied nonmedical psychotherapy.

■　Where the prosecution seeks to introduce a witness's preliminary hearing testimony at trial, it has the burden of proving by competent evidence that the witness is unavailable. (*People* v. *Stritzinger* (1983) 34 Cal.3d 505, 516 [194 Cal.Rptr. 431, 668 P.2d 738]; *People* v. *Williams* (1979) 93 Cal.App.3d 40, 51 [155 Cal.Rptr. 414].) The prosecution must prove the witness's unavailability by a preponderance of the evidence (see *People* v. *Williams, supra*, 93 Cal.App.3d at p. 51), and not to complete certainty. (See *People* v. *Macioce* (1987) 197 Cal.App.3d 262, 281-283 [242 Cal.Rptr. 771] [70 percent probability that testifying would be detrimental was sufficient to support the trial court's finding of witness unavailability].)

■　Where, as here, the unavailability is caused by an incapacitating physical or mental condition existing at trial, "the illness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness's attendance, or his testifying, relatively impossible and not merely inconvenient. However, we cannot say just what illness or infirmity must be shown or the degree of its severity, leaving that determination to a trial court's exercise of discretion." (*People* v. *Gomez* (1972) 26 Cal.App.3d 225, 230 [103 Cal.Rptr. 80].) However, the prosecution need not show reasonable diligence to produce the witness, or permanent unavailability or incapacity. (*Id.* at pp. 228-230.) Subdivision (c) of section 240, which recognizes that crime-induced trauma which would be substantially reinflicted by testifying can, if proved, render a witness unavailable, was enacted 12 years after *Gomez*. Subdivision (c) thus must be considered with the *Gomez* language describing conditions which adequately demonstrate unavailability.

■　The parties dispute whether our review of the trial court's ruling is governed by the abuse of discretion or independent review standard. Before 1986, it was settled that review of a trial court's ruling regarding witness unavailability was governed by the abuse of discretion standard. (*People* v.

*Jackson* (1980) 28 Cal.3d 264, 312 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73]; *People* v. *Williams, supra,* 93 Cal.App.3d at pp. 54-55; *People* v. *Gomez, supra,* 26 Cal.App.3d at p. 230.) In *People* v. *Louis* (1986) 42 Cal.3d 969 [232 Cal.Rptr. 110, 728 P.2d 180], in which the trial court found the prosecution used due diligence to locate an unavailable witness, the Supreme Court acknowledged the existing rule but appeared to reverse itself and suggested that such review should be governed by the independent review standard. (*Id.* at pp. 984-988.) However, the *Louis* court expressly did not decide the issue and determined that under either standard, the showing of unavailability made in that case was insufficient. (*Id.* at p. 989.) Later, the Supreme Court clarified the *Louis* dicta, explaining that the court previously *held* such review governed by the abuse of discretion standard, while *Louis* merely "suggested (but did not decide) that an appellate court should independently review the record on the due diligence issue." (*People* v. *Hovey* (1988) 44 Cal.3d 543, 563 [244 Cal.Rptr. 121, 749 P.2d 776].) The *Hovey* court held that under either standard, the trial court's finding of witness unavailability was proper. (*Id.* at pp. 563-564.) Thus, *Hovey* clarified that the *Louis* dicta did not change the rule that appellate review of a trial court's ruling on witness unavailability is governed by the abuse of discretion standard.

Turner relies on the *Louis* dicta and a recent case which follows it. (*People* v. *Watson* (1989) 213 Cal.App.3d 446, 452 [261 Cal.Rptr. 635].) However, *Watson* cited *Louis* without discussion or analysis, and failed to cite or discuss *Hovey* and its clarification of the *Louis* dicta. Moreover, the *Watson* court neither addressed nor resolved this issue, and affirmed the lower court's finding of unavailability. We agree with *People* v. *McElroy* (1989) 208 Cal.App.3d 1415 [256 Cal.Rptr. 853] which, after a lengthy analysis of the *Louis* dicta and *Hovey* clarification (*id.* at pp. 1425-1426), concluded that "the most recent Supreme Court guidance on this issue both reaffirmed the vitality of prior cases applying the 'abuse of discretion' standard, and cautioned that any contrary analysis or suggestions in *People* v. *Louis, supra,* 42 Cal.3d 969 were dicta. We adhere to the Supreme Court's guidance, and therefore apply the abuse of discretion standard to this case." (*Id.* at p. 1426.) Even were we free to endorse either rule, we would on policy grounds adopt the abuse of discretion standard for review of such rulings. (See *People* v. *McElroy, supra,* 208 Cal.App.3d at pp. 1426-1427, fn. 7; cf. *People* v. *Louis, supra,* 42 Cal.3d at pp. 984-988.)

■ Turner contends the trial court erred in finding Ms. W. medically unavailable because there was no medical testimony, no evidence regarding her condition at the time of trial, and inadequate foundation for Monteiro's opinion. Turner first claims that because Monteiro's opinion was partially

based on facts conveyed in a hypothetical question, she was engaging in theoretical rather than applied psychotherapy and was not properly an expert as defined in section 1010, subdivision (c). Turner cites no authority for this proposition. First, experts may rely on facts outside their personal knowledge. (§§ 801, 804.) Second, in giving an opinion regarding the effect of future testimony on a potential witness, the expert necessarily must theorize.

Turner also claims that only an expert who actually treated the witness shortly before the hearing can provide adequate evidence of trauma-based medical unavailability. But Turner does not argue that the facts hypothesized to Monteiro were not proved; indeed, the hypothetical summarized the testimony of the other witnesses. Likewise, Turner does not claim the evidence was inadmissible, but merely argues it was insufficient. We disagree. Monteiro treated Ms. W. once, and her opinion also was based on facts observed by witnesses over a two and one-half year period. In essence, Turner argues that the prosecution must conclusively prove trauma-based unavailability, and can do so only through a physician who is treating the witness at the time of the hearing. We reject this contention.

Turner relies on People v. Stritzinger, supra, 34 Cal.3d at pages 515-521, and People v. Williams, supra, 93 Cal.App.3d at pages 50-55. Both cases reversed trial court findings that crime victims were medically unavailable. In Stritzinger, a child molestation victim's mother provided the only evidence of her daughter's trauma and psychological impairment. The court held that while lay witnesses could provide evidence of a present infirmity, expert testimony was required to demonstrate that the infirmity prevented the witness from testifying. Likewise, in Williams, a rape victim was reluctant to testify at a retrial. Lay witnesses testified that while she was distraught before and during the first trial, her symptoms thereafter abated. The prosecution presented no expert evidence. Both cases are distinguishable. In neither case did the victim expressly refuse to testify. In the case before us, the prosecution presented a statutorily defined expert who treated the victim. The victim's symptoms became progressively worse, and did not abate. Moreover, after testifying a second time, Ms. W. consistently refused to provide samples, go to court, or testify.

In People v. Macioce, supra, 197 Cal.App.3d at pages 281-283, a day before her husband's murder, the defendant complained to a friend of the husband's dishonesty and infidelity. The friend testified at the preliminary hearing and thereafter began seeing a family physician for symptoms of extreme stress caused by her impending trial testimony. At an unavailability hearing the physician opined that testifying again would be harmful to the friend's health. The physician admitted that the friend's symptoms had

improved and testifying might not affect her at all, but thought there was a 70 percent chance that it would be detrimental. The appellate court affirmed the defendant's murder conviction and approved the trial court's finding that the friend was unavailable and the admission of her preliminary hearing testimony.

In *Macioce,* the friend testified once and was neither a victim of nor witness to a crime. Her stress symptoms had abated, and the physician who testified regarding her condition was not an expert in mental disorders. The trial court's unavailability finding was upheld despite this much smaller volume of proof. However, in our case Ms. W., who was kidnapped and raped at gunpoint, testified twice, and became increasingly depressed. Her condition worsened after each contact with the criminal justice system, and her progressively incapacitating symptoms were reported by a police officer, a witness assistant, a treating therapist, friends, relatives, and a prosecutor. After testifying the second time, Ms. W. repeatedly and emphatically told everyone, including Turner's investigator, she would not provide samples, come to court, or testify. (Cf. *People* v. *Francis* (1988) 200 Cal.App.3d 579, 586-588 [245 Cal.Rptr. 923].) A statutorily defined mental health expert who treated Ms. W. diagnosed her as suffering from rape-induced posttraumatic stress disorder requiring long-term treatment. Based on prior and subsequent conduct postulated in a proper hypothetical question, as well as her personal treatment of Ms. W., Monteiro believed that testifying again would further harm Ms. W. The most recent and hysterical refusal was a few days before the unavailability hearing. We hold these facts amply support the trial court's finding that Ms. W. was unavailable and the admission of her preliminary hearing testimony at trial.

II-V*

. . . . . . . . . . . . . . . . . . . .

DISPOSITION

We affirm the judgment.

Hanson, Acting P. J., and Devich, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 1, 1990.

---

*See footnote, *ante,* page 1207.